**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jeffrey Lihosit, | No. CV-15-01224-PHX-NVW |
| Plaintiff, | **ORDER** |
| v. | |
| Jason Flam and Jane Doe Flam, husband and wife; Patrick Carroll and Jane Doe Carroll, husband and wife; City of Mesa, a municipal entity; and John Does I-X, ABC Corporations I-X, and XYZ Partnerships I-X, | |
| Defendants. | |

Before the Court is Defendants' Motion to Dismiss (Doc. 26).  Oral argument was heard on May 4, 2016.  For the reasons that follow, the Motion will be granted.

## I.   BACKGROUND

Jeffrey Lihosit claims that two police officers used excessive force in the course of arresting him.  He describes the incident in his First Amended Complaint.  Defendants have submitted a video and transcript of the incident, as well as documents from the post-arrest municipal court proceedings.

1

### A.     Lihosit's Allegations

2      The First Amended Complaint (Doc. 25) alleges as follows.  On the evening of

3  October 29, 2014, City of Mesa Police Officer Patrick Carroll and Detective Jason Flam

4  spoke with Lihosit outside his home about his recent communication with his ex-wife.

5  (*Id.* at ¶ 11.)  The officers did not arrive with the intention to arrest him.  (*Id.* at ¶ 12.)

6  Throughout the conversation Lihosit was calm and unarmed.  (*Id.* at ¶ 13, 19.)  He was

7  smoking a cigarette and holding a cup of coffee.  (*Id.* at ¶ 13.)  He never raised his voice

8  or made any threats.  (*Id.*)

9      During the conversation, Lihosit read aloud a text message from his wife which

10  stated in part, "This is ridiculous, just like you."  (*Id.* at ¶ 14.)  Officer Carroll mistakenly

11  thought Lihosit was referring to the officers and threatened to "punch [Lihosit] in the

12  face."  (*Id.* at ¶ 15.)  Lihosit then looked at Officer Carroll and asked him if he had just

13  threatened harm.  (*Id.* at ¶ 16.)  Detective Flam said that Officer Carroll did not make a

14  threat.  (*Id.* at ¶ 17.)

15      Lihosit asked to speak with the officers' supervisor.  (*Id.* at ¶ 18.)  In response to

16  Lihosit's request, Detective Flam pointed his Taser at Lihosit and said, "You are about to

17  be lit up!"  (*Id.* at ¶ 19.)  The officers then arrested Lihosit in order to cover up their use

18  of excessive force.  (*Id.* at ¶ 20.)

19      Lihosit's neighbors and other passers-by saw this incident.  (*Id.* at ¶ 22.)  Lihosit

20  suffered "anguish and pain and suffering," "post-traumatic stress-disorder," and

21  "humiliation in front of his kids, girlfriend and neighbors."  (*Id.* at ¶ 24.)  Neighbors will

22  not let their children play with Lihosit's children anymore, and Lihosit's role as leader of

23  his son's boy-scout group is jeopardized.  (*Id.*)

24      Lihosit brings this action under 42 U.S.C. § 1983.  (*Id.* at 6–11.)  He claims that

25  the officers used excessive force in violation of the Fourth Amendment.  (*Id.* at 6–9.)  He

26  also claims that this violation resulted from the City of Mesa's policies, practices, or

27

28

1

2

customs and its failure to train and supervise its officers.  (*See id.* at ¶¶ 26, 49–58.)  He

seeks damages against the officers and the City, jointly and severally.  (*Id.* at 11.)

3

### B.      Video, Transcript, and Municipal Court Documents

4

Defendants submitted a video of the incident ("Video"), taken from Detective

5

Flam's body camera.  (*See* Doc. 33.)[1]  Defendants also submitted a transcript of the

6

incident, written by a third party who watched and listened to the Video.  (*See* Doc. 26-

7

2.)  Lihosit does not dispute the authenticity of the Video or the transcript.  (Docs. 35,

8

36.)   Defendants also submitted copies of the charges brought against Lihosit in

9

municipal court after the arrest, as well as copies of that court's findings.  (*See* Doc. 26-

10

1.)

11

The Video and transcript provide a fuller picture of what happened.  Detective

12

Flam, Officer Carroll, and Lihosit were standing outside, within a few feet from each

13

other, talking.  (*See* Video; *accord* Doc. 25 at ¶ 19.)  Officer Carroll told Lihosit that the

14

reason they were there was to address Lihosit's recent communication with his ex-wife,

15

in light of a court order limiting such communication:

16

17

18

19

> OFFICER CARROLL:  What we're here to address is that
> you were served with an order of the court saying that you're
> not to contact her, except in regards to the children.  Okay?
> She made a complaint regarding one of the [communications]
> . . . .

20

(Video at 0:04–0:11; Doc. 26-2 at 3.)  Lihosit offered to read his recent communications

21

with his ex-wife from his phone; the officers agreed.  (Video at 0:32–0:37; Doc. 26-2 at

22

4.)  Looking through his phone, Lihosit muttered, "This is ridiculous, guys.  You guys

23

have no idea."  (Video at 0:39–0:43; Doc. 26-2 at 4.)  Lihosit then read aloud a text

24

message.  (Video at 0:58–1:10; Doc. 26-2 at 4.)  Detective Flam specified that the

25

26

27

28

---

[1] The Video is not accessible from the electronic case docket.  Defendants delivered the Video to Lihosit and the Court on a CD.  Defendants then filed a notice of delivery, which is part of the case docket.  (Doc. 33.)

communication in question was an email, not a text message.  (Video at 1:15–1:22; Doc. 26-2 at 4–5.)  Looking through his phone again, Lihosit declared, "I ain't contacting her anymore.  I understand the point."  (Video at 1:24–1:26; Doc. 26-2 at 5.)

Lihosit then read aloud from his phone, "This is ridiculous, just like you."  Upon hearing this, Officer Carroll began to argue, but Detective Flam clarified that Lihosit was simply reading an email.  Officer Carroll then said that Lihosit "was about to get punched in the face":

> MR. LIHOSIT [Reading from phone screen]:   This is ridiculous, just like you.
>
> OFFICER CARROLL:  Well—
>
> DETECTIVE FLAM:  No.  No, no—
>
> OFFICER CARROLL:  —if he was ridiculous—
>
> DETECTIVE FLAM:  —that's the—no, no, no.  He's reading the email.  I'm sorry.  [Laughing]
>
> OFFICER CARROLL:  He was about to get punched in the face.

(Video at 1:30–1:38; Doc. 26-2 at 5.)

Upon hearing Officer Carroll's remark, Lihosit turned his head toward Officer Carroll and asked, "Did you just tell me you were gonna punch me in the face?"  He then turned the rest of his body toward Officer Carroll and repeated the question:

> MR. LIHOSIT:  Did you just tell me you were gonna punch me in the face?
>
> DETECTIVE FLAM:  Hey, you know what—
>
> OFFICER CARROLL:  Read your email.
>
> MR. LIHOSIT:  Did you just tell me you were gonna punch me in the face?
>
> OFFICER CARROLL:  I said you were about to.

1

(Video at 1:39–1:43; Doc. 26-2 at 5.)

2

3

4

5

Detective Flam pointed a Taser at Lihosit's chest and warned that he would be tased if he walked toward Officer Carroll again.  Lihosit stated that he did not walk toward anyone, and he asked Detective Flam to call a supervisor.  The officers insisted that Officer Carroll did not make a threat:

6

7

>DETECTIVE FLAM:  I'm going to Taze you if you walk towards my officer again—

8

>MR. LIHOSIT:  I didn't walk—

9

10

>DETECTIVE FLAM:  —I'm not playing.

11

>MR. LIHOSIT:  —towards anybody.

12

>DETECTIVE FLAM:  I'm not messing around.

13

14

>MR. LIHOSIT:  Call your supervisor.  He just threatened to punch me in the face.

15

>OFFICER CARROLL:  No, I said—

16

>DETECTIVE FLAM:  No, he did not.  You know what—

17

>MR. LIHOSIT:  [Indiscernible] check that.

18

(Video at 1:44–1:51; Doc. 26-2 at 5–6.)

19

20

21

Detective Flam ordered Lihosit to put his coffee down and warned that Lihosit was "about to get lit up."  He then ordered Lihosit to kneel and place his hands on his head:

22

23

>DETECTIVE FLAM:  You know what, put your coffee down.

24

>MR. LIHOSIT:  [Indiscernible] [turns back on officers].

25

26

>DETECTIVE FLAM:  Have you—have you been Tazed before?

27

>MR. LIHOSIT: No.  I'm not—

28

> DETECTIVE FLAM:  Okay, 'cause you're about to get lit up.  Put your cigarette down.
>
> MR. LIHOSIT:  Okay, I'm not doing anything.
>
> DETECTIVE FLAM:  You know what, you're a big guy.  I want you to kneel down right here and put your hands on your head.
>
> MR. LIHOSIT:  Whatever.

(Video at 1:51–2:04; Doc. 26-2 at 6.)   Lihosit was handcuffed and arrested without further incident.  (Video at 2:04–2:47; Doc. 26-2 at 6–7.)

According to municipal court documents, Lihosit was charged two days later for violating an order of protection.  (Doc. 26-1 at 2.)  Violating an order of protection is a class 1 misdemeanor.  A.R.S. §§ 13-2810(A)(2), (B).  The municipal court found Lihosit guilty.  (Doc. 26-1 at 3–4.)

## II.   LEGAL STANDARD

Defendants move to dismiss the First Amended Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  (Doc. 26.)

When considering a motion to dismiss, a court evaluates the legal sufficiency of the plaintiff's pleadings.  Dismissal under Rule 12(b)(6) can be based on "the lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory."  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  To avoid dismissal, a complaint need include "only enough facts to state a claim for relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

On a motion to dismiss under Rule 12(b)(6), all allegations of material fact are assumed to be true and construed in the light most favorable to the non-moving party.  *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).  However, that principle does not apply to legal conclusions or conclusory factual allegations.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* To show that the plaintiff is entitled to relief, the complaint must permit the court to infer more than the mere possibility of misconduct. *Id.* If the plaintiff's pleadings fall short of this standard, dismissal is appropriate.

Generally, material beyond the pleadings may not be considered in deciding a Rule 12(b)(6) motion. However, a court may properly look beyond the complaint to matters of public record, and doing so does not convert a Rule 12(b)(6) motion to one for summary judgment. *Mack v. S. Bay Beer Distributors, Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986). Therefore the Court considers the municipal court documents submitted by Defendants (Doc. 26-1) in deciding the present motion.

A court may also look to documents on which the complaint necessarily relies, if their authenticity is not contested. *Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir. 2013). Lihosit's complaint necessarily relies on the circumstances surrounding his arrest. Defendants have submitted a Video (*see* Doc. 33) and transcript (Doc. 26-2) of the incident. While these are not "documents" in the traditional sense, they are essential to a full understanding of the events underlying Lihosit's complaint, and Lihosit does not dispute their authenticity. (Docs. 35, 36.) Therefore the Court considers the Video and transcript in deciding the present motion, and this consideration does not convert the motion to one for summary judgment.

Even if the motion were converted to one for summary judgment, the Court need only provide the parties "a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). Here, no further opportunity is warranted. At oral argument, Lihosit's counsel conceded that the images and sounds in the Video are accurate, and he reserved the right to offer supplemental evidence only to the extent that the Video is ambiguous or subject to multiple inferences. (*See* Doc. 35 at

1
2
3
4
5

1.) The Court considers the Video only to the extent that it is unambiguous and not subject to multiple inferences. (*See id.*) Lihosit also concedes that the transcript is accurate. (Doc. 36.) Because Lihosit cannot offer evidence contradicting the Video or transcript, there is no need for an opportunity to do so.

6
7

## III.   ANALYSIS

Lihosit fails to state a claim for constitutionally excessive force, and in any event the officers are entitled to qualified immunity.

8
9

### A.      The Force Used Was Not Excessive.

10
11
12
13
14
15
16
17

Whether a law enforcement officer used excessive force in the course of an arrest must be analyzed under the Fourth Amendment and its "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

18
19
20
21
22
23
24
25
26
27
28

Excessive force analysis involves three steps: (1) assessing the severity of the intrusion on the individual's constitutional rights by evaluating the type and amount of force inflicted, (2) evaluating the government's interest in the use of force, and (3) balancing the gravity of the intrusion on the individual's rights against the government's need for that intrusion. *Lowry v. City of San Diego*, --- F.3d ----, 2016 WL 1273183, at *3 (9th Cir. Apr. 1, 2016). The government's interest in the use of force depends on numerous factors, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of officers or others, and whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011). The most important factor is whether the suspect posed an

1
2
3
4

immediate threat to safety.  *Id.*  But balancing the individual's constitutional interests against the government interests at stake requires considering "the totality of the circumstances, including whatever factors may be relevant in a particular case."  *Marquez v. City of Phoenix*, 693 F.3d 1167, 1174–75 (9th Cir. 2012).

5

### 1.	The type and amount of force used was minimal.

6
7
8

Lihosit does not challenge the arrest itself, but the force used leading up to it: namely, the officers' words and pointing of a Taser.  To the extent these actions constitute force, it is minimal.

9
10
11
12

First, Officer Carroll stated, while standing near Lihosit, "He was about to get punched in the face."  This statement was not force at all.  Officer Carroll was talking *about* Lihosit rather than to him, expressing what *would have* happened rather than what will happen.

13
14
15
16
17

Seconds later, as the interaction grew heated, Detective Flam pointed his Taser at Lihosit's chest and stated, "You're about to get lit up."  In contrast with Officer Carroll's statement, this was a warning, which may be indistinguishable from a threat.  Detective Flam was talking directly to Lihosit, expressing what will happen if he continues acting a certain way.

18
19
20
21
22
23
24
25
26
27

Lihosit was not actually punched or tased.  In fact, he alleges no physical injury.  He alleges only "anguish and pain and suffering," "post-traumatic stress-disorder," "humiliation," and forms of social exclusion.  It is difficult to see how the officers' conduct caused any actual damage.  But the Ninth Circuit has specified that excessive force need not involve "deadly force or physical blows" and that "a plaintiff may recover 'nominal damages without proof of actual injury' for unreasonable intrusions on one's bodily integrity."  *Headwaters Forest Def. v. Cty. of Humboldt*, 240 F.3d 1185, 1199 (9th Cir. 2000) (quoting *Larez v. City of Los Angeles*, 946 F.2d 630, 640 (9th Cir. 1991)), *vacated and remanded on other grounds*, 534 U.S. 801 (2001).  Therefore, although the force used here was minimal, its reasonableness must still be evaluated.

28

1          **2.      The officers had a non-trivial interest in using force.**

2          As explained, Officer Carroll's statement—that Lihosit "was about to get punched

3    in the face"—was not force.  It need not be evaluated under the Fourth Amendment at all.

4    But even if it was force, it was a reaction to a perceived insult.  Seconds earlier, Lihosit

5    had said, "This is ridiculous, just like you."  Officer Carroll mistakenly thought Lihosit

6    was referring to the officers.  Although calling an officer "ridiculous" is not an evasion of

7    arrest, it suggests an unwillingness to cooperate.  Lihosit had voiced a similar sentiment

8    earlier in the conversation when he looked through his phone and muttered, "This is

9    ridiculous, guys.  You guys have no idea."

10          Detective Flam's pointing and threatening to use his Taser was an attempt to

11   defuse a volatile situation.  Lihosit had become somewhat confrontational.  Upon hearing

12   Officer Carroll, he stopped reading from his phone, turned his head toward Officer

13   Carroll, and asked, "Did you just tell me you were gonna punch me in the face?"  When

14   Officer Carroll dodged the question, Lihosit asked again, this time turning his entire body

15   toward Officer Carroll, "Did you just tell me you were gonna punch me in the face?"

16   They were within a few feet from each other.  Detective Flam deemed Lihosit a threat to

17   Officer Carroll's safety, so he aimed his Taser at Lihosit and warned that he was "about

18   to get lit up."

19          Lihosit alleges that throughout this interaction he remained calm and unarmed and

20   did not raise his voice or make any threats.  Admittedly, these characteristics suggest that

21   he was unlikely to actually attack Officer Carroll.  But Detective Flam decided not to take

22   any chances.

23          **3.      The officers' use of force was justified.**

24          Again, Officer Carroll's statement that Lihosit "was about to get punched in the

25   face" was not force at all.  But even if it was, it was a reasonable reaction to what he

26   perceived to be an insult and an unwillingness to cooperate.  Although that perception

27   was mistaken, Officer Carroll's actions must not be viewed "with the 20/20 vision of

28

1
2
3

hindsight." *Graham*, 490 U.S. at 396.  The Fourth Amendment allows for the possibility that an officer will lose his temper and make mistakes.  Of course, this is not to say that actually punching or directly threatening to punch Lihosit would have been reasonable.

4
5
6
7
8
9

Detective Flam's threatened use of his Taser was a reasonable method of ensuring Officer Carroll's safety.  Ensuring safety is the most important factor in determining whether an officer's force was excessive.  *Mattos*, 661 F.3d at 441.  Lihosit was apparently becoming combative, having turned toward Officer Carroll and asked, twice, "Did you just tell me you were gonna punch me in the face?"  Detective Flam eliminated the risk of further escalation by warning Lihosit that he would use his Taser.

10
11
12
13
14
15
16
17

Such warnings are not just permissible, but preferable.  Had Detective Flam actually used his Taser, the constitutionality would depend in part on whether he had given Lihosit adequate warning.  *Compare Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1092 (9th Cir. 2013) (use of Taser excessive where no prior warning was given), *Mattos*, 661 F.3d at 451 (same), *and Bryan v. MacPherson*, 630 F.3d 805, 831–32 (9th Cir. 2010) (same), *with Marquez v. City of Phoenix*, 693 F.3d 1167, 1175–76 (9th Cir. 2012) (use of Taser not excessive where prior warning was given).  Detective Flam did not violate the Constitution by doing what it might have required had things turned out differently.

18
19
20
21
22
23
24

It is hard to see how Detective Flam could have resolved the situation in an equally effective, less intrusive way.  Even if such an alternative existed, the Fourth Amendment does not require officers to use the "least intrusive" degree of force.  *Bryan v. MacPherson*, 630 F.3d 805, 813 (9th Cir. 2010).  Officers must make "split second judgments" in "tense, uncertain, and rapidly evolving" situations.  *Graham*, 490 U.S. at 396.  That is what Detective Flam did.  As a result, Lihosit was arrested without further incident.

25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.    Even if the Force Was Excessive, the Officers Are Entitled to Qualified Immunity.**

Under § 1983, government officials sued in their individual capacities may assert the affirmative defense of qualified immunity, which generally protects them from civil damages for performance of discretionary duties. *Mueller v. Auker*, 576 F.3d 979, 992 (9th Cir. 2009); *Butler v. Elle*, 281 F.3d 1014, 1021 (9th Cir. 2002).  Qualified immunity protects an official who "makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances."  *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).  "The standard is an objective one that leaves 'ample room for mistaken judgments.'"  *Mueller*, 576 F.3d at 992 (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)).  "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.  When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) (quoting *Malley*, 475 U.S. at 341).

To determine whether a law enforcement officer is entitled to qualified immunity, the district court must determine (1) whether the officer violated a plaintiff's constitutional right and (2) whether that right was "clearly established in light of the specific context of the case" at the relevant time. *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc).  The Court has already determined that Detective Flam and Officer Carroll did not violate Lihosit's constitutional right.  For that reason alone, they are entitled to qualified immunity.  Further, even if they did violate Lihosit's constitutional right, the right was not "clearly established" at the time.

To determine whether Lihosit's constitutional right was clearly established, the Court must consider whether the contours of the law were "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* at 442 (quoting *al-Kidd*, 563 U.S. at 741).  The law may be clearly established without a case directly on point, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*  The Supreme Court "has repeatedly told

1

2

3

4

5

courts . . . not to define clearly established law at a high level of generality." *Mullenix v. Luna*, --- U.S. ----, 136 S. Ct. 305, 308 (2015) (quoting *al-Kidd*, 563 U.S. at 742). "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 742) (emphasis in *Mullenix*). "Such specificity is especially important in the Fourth Amendment context." *Id.*

6

7

8

9

10

11

12

13

14

Lihosit has not identified any precedent, binding or otherwise, under which the officers' conduct would be constitutional. Nor does the Court know of any. In briefing and at oral argument, Lihosit has attempted to analogize to a case where a police officer pointed a gun at a suspect's head. *Robinson v. Solano Cty.*, 278 F.3d 1007, 1010 (9th Cir. 2002). This analogy fails because a Taser is only "an intermediate level of force." *See Bryan*, 630 F.3d at 826. Unlike the plaintiff in *Robinson*, Lihosit does not claim that he feared for his life. Therefore, even if the officers violated Lihosit's constitutional right, the right was not "clearly established." The officers are immune to Lihosit's claim for damages.

15

### C.    Leave to Amend

16

17

18

19

20

Leave to amend should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). Courts should consider five factors: bad faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the plaintiff has previously amended the complaint. *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004). "Futility alone can justify the denial of a motion to amend." *Id.*

21

22

23

24

Amendment would be futile here. Lihosit has already amended his complaint once. The Video and transcript submitted by Defendant show that Lihosit cannot allege anything more to salvage his claims. Thus, no further leave to amend will be granted.

25

26

27

IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss (Doc. 26) is granted with prejudice.

28

- 13 -

1

2      IT IS FURTHER ORDERED that the Clerk shall enter separate judgment
terminating this case for failure to state a claim upon which relief may be granted.

3      Dated this 16th day of May, 2016.

4

5

6

7                          Neil V. Wake
                   United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 14 -